**CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON, Restaurant Opportunities Centers United, Inc., Jill Phaneuf, and Eric Goode, Plaintiffs,**

v.

**Donald J. TRUMP, in his official capacity as President of the United States of America, Defendant.**

**17 Civ. 458 (GBD)**

United States District Court, S.D. New York.

Signed December 21, 2017

Daniel A. Small, Cohen, Millstein, Hausfeld & Toll, P.L.L.C., Joseph M. Sellers, Robert Abraham Braun, Cohen Milstein Sellers & Toll PLLC, Matthew Douglas Spurlock, Deepak Gupta, Jonathan Ellis Taylor, Gupta Wessler PLLC, Washington, DC, George Fuad Farah, Cohen Milstein Sellers & Toll PLLC, New York, NY, for Plaintiffs.

Jean Lin, U.S. Dep't of Justice, Civil Div, Brett Shumate, James R. Powers, U.S. Department of Justice, Washington, DC, for Defendant.

## MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, United States District Judge:

Plaintiffs Citizens for Responsibility and Ethics in Washington ("CREW"), Restaurant Opportunities Centers United, Inc. ("ROC United"), Jill Phaneuf, and Eric Goode (collectively, "Plaintiffs"), bring this suit against Defendant Donald J. Trump, in his official capacity as President of the United States. (Second Amended Complaint ("SAC"), ECF No. 28, at 1.) Plaintiffs principally allege that Defendant's "vast, complicated, and secret" business interests are creating conflicts of interest and have resulted in unprecedented government influence in violation of the Domestic and Foreign Emoluments Clauses of the United States Constitution. (SAC ¶ 1 (citing U.S. Const. art. I, § 9, cl. 8 & art. II, § 1, cl. 7, respectively).) Plaintiffs seek (i) a declaratory judgment declaring that Defendant has violated and will continue to violate the Domestic and Foreign Emoluments Clauses; (ii) an injunction enjoining Defendant from violating the Emoluments Clauses; and (iii) an injunction requiring Defendant to release financial records in order to confirm that he is not engaging in further transactions that would violate the Emoluments Clauses. (*Id.* ¶ 20.)

Defendant argues that Plaintiffs lack standing to sue and moves to dismiss this lawsuit for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure Rule 12(b)(1). (Def.'s Mot. to Dismiss, ECF No. 34; Def.'s Mem. of Law in Supp. of Mot. to Dismiss ("Mot."), ECF No. 35, at 7.) Defendant also moves to dismiss this case for failure to state a claim under the Emoluments Clauses pursuant to Federal Rule of Civil Procedure Rule 12(b)(6). (*See* Mot. at 26.)

Defendant's motion to dismiss for lack of standing under Rule 12(b)(1) is GRANTED.[1]

---

1. Because Plaintiffs' claims are dismissed under Rule 12(b)(1), this Court does not reach the issue of whether Plaintiffs' allegations

## I. FACTUAL BACKGROUND

### A. The Parties

Plaintiff CREW is a nonprofit, nonpartisan government ethics watchdog organized under the laws of the State of Delaware. (SAC ¶ 21.) CREW's self-proclaimed mission is to "protect[ ] the rights of citizens to be informed about the activities of government officials, ensur[e] the integrity of government officials, protect[ ] [the] political system against corruption, and reduc[e] the influence of money in politics." (Id.) It seeks to advance that mission through a combination of research, advocacy, litigation, and education, all aimed at raising public awareness about the influence of outside special interests on public officials. (Id. ¶ 22.) For instance, CREW is involved in a project relating to campaign finance and ethics at the state-level, as well as researching and filing comments with government agencies related to rulemakings and other regulatory actions, and preparing reports on "money-in-politics issues." (Id. ¶¶ 166–67, 171.) CREW also analyzes tax returns of nonprofit groups engaged in political activities and publishes blog posts and reports to educate the public. (Id. ¶ 173.) In addition, during the last several election cycles, CREW has filed numerous administrative complaints with the Federal Election Commission and the Department of Justice alleging violations of campaign finance laws. (Id. ¶ 164.)

Plaintiff ROC United is a nonprofit, nonpartisan member-based organization organized under the laws of the State of New York. (Id. ¶ 28.) ROC United's members include nearly 25,000 restaurant employees, over 200 restaurants, and about 3,000 other dining establishments. (Id. ¶ 11.) ROC United provides "job training, placement, leadership development, civic engagement, legal support, and policy advocacy" to help improve working conditions in the food service industry. (Id.) Through its RAISE project, ROC United works with restaurant owners to implement sustainable business models that support "high road" employer practices such as paying living wages, providing basic benefits, being environmentally sustainable, and providing safe and healthy workplaces. (Id. ¶ 181.) ROC United also owns and operates a restaurant in New York City and another in Detroit, with a forthcoming location in Washington, D.C. (Id. ¶ 28.)

Plaintiff Jill Phaneuf, a resident of Washington D.C., works with a hospitality company to book embassy functions and other events tied to foreign governments, as well as other events "in the Washington, D.C. market." (Id. ¶ 15.) In particular, Phaneuf books events for two Washington D.C. hotels—the Carlyle Hotel, located just north of Dupont Circle, and the Glover Park Hotel, located near the area that is colloquially referred to "Embassy Row." (Id. ¶ 15.) Phaneuf alleges that her compensation consists of a percentage of the gross receipts of the events she books. (Id.)

Plaintiff Eric Goode is a New York resident and the owner of several hotels, restaurants, bars, and event spaces in New York City. (Id. ¶ 18.) He owns the Maritime Hotel located in the Chelsea neighborhood, the Bowery Hotel and Ludlow Hotel, both of which are located in the Lower East Side, and the Jane Hotel in the Meatpacking District. (Id.) Goode also owns several restaurants located in the Bowery Hotel. (Id.) Goode alleges that his hotels and restaurants have typically attracted business from foreign governments, as well as from federal and state

---

state a cause of action under either the Domestic or Foreign Emoluments Clauses, pursuant to Rule 12(b)(6). Nor does this Court address whether the payments at issue would constitute an emolument prohibited by either Clause.

government officials traveling on official business. (*Id.*)

Defendant Donald J. Trump is the President of the United States of America. Before he was elected President, Defendant amassed ownership and controlling interests in businesses throughout the country and around the world. Defendant is the sole owner of the Trump Organization LLC and The Trump Organization, Inc. (collectively, the "Trump Organization"). (*Id.* ¶ 42.) Defendant's corporations, limited-liability companies, limited partnerships, and other entities are loosely organized under the Trump Organization. (*Id.*)

On January 11, 2017, Defendant, then-President-elect, announced that he would turn over the "leadership and management" of the Trump Organization to his sons, Donald Trump, Jr. and Eric Trump. (*Id.* ¶ 43.) Defendant also announced that he would donate all profits from foreign governments' patronage of his businesses to the U.S. Treasury. (*Id.*; *see also Donald Trump's News Conference: Full Transcript and Video,* N.Y. Times (Jan. 11, 2017), http://nyti.ms/2jG86w8.) Although Defendant had established a trust to hold his business assets, Plaintiffs allege that Defendant continues to own and is permitted to take distributions from the trust at any time. (SAC ¶ 44.) Plaintiffs allege that Defendant continues to be informed of the Trump Organization's business activities and that Eric Trump provides business updates to Defendant on a quarterly basis. (*Id.*)

Through his various business entities, Defendant owns and receives payments from a number of properties and restaurant establishments in the United States. Of particular relevance here, Defendant owns the Trump International Hotel in Washington, D.C. and the BLT Prime, a restaurant located inside the hotel. (*Id.* ¶¶ 58–59.) He also owns Trump World Tower, a condominium high-rise building in New York City located near the United Nations. (*Id.* ¶ 90.) Trump Tower, a mixed-use skyscraper in New York City, and Trump Grill, a restaurant located inside the tower, are also among the properties owned by Defendant. (*Id.* ¶¶ 46–47, 56.)

### B. Defendant's Alleged Violations of the Domestic and Foreign Emoluments Clauses

Plaintiffs allege that since Defendant's inauguration earlier this year, he has violated and continues to violate the Domestic and Foreign Emoluments Clauses of the Constitution due to the ownership and controlling interests he continues to hold in the Trump Organization and other entities, and the monies he receives as a result. (*Id.* ¶¶ 7, 42.)

The Domestic Emoluments Clause states that "[t]he President shall, at stated Times, receive for his Services, a Compensation, which shall neither be encreased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them." U.S. Const. art. II, § 1, cl. 7. That clause provides that the president's compensation for his services as president shall not change during his term in office, and prohibits him from drawing any additional compensation or salary from the federal or state governments.

The Foreign Emoluments Clause states in pertinent part that "no Person holding any Office of Profit or Trust under them, shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State." U.S. Const. art. I, § 9, cl. 8. That clause provides that certain federal government officials shall not receive any form of gift or

compensation from a foreign government without Congress's approval.[2]

Plaintiffs point to a number of examples of alleged violations of both the Domestic and Foreign Emoluments Clauses. For example, Plaintiffs allege that after the 2016 election, and under pressure from the Trump Organization, the Embassy of Kuwait in Washington D.C. moved its National Day celebration from the Four Seasons Hotel to the Trump International Hotel, spending an estimated $40,000 to $60,000 for the event. (SAC ¶¶ 72–74.) Other foreign diplomats and their agents have publicly expressed a desire to patronize the Trump International Hotel and other properties owned by Defendant to curry favor with the President. (*Id.* ¶¶ 57–89.) One press account quoted a "Middle Eastern diplomat" as saying, "[b]elieve me, all the delegations will go" to the Trump International Hotel. (*Id.* ¶ 62.) The same account quoted an "Asian diplomat" who explained, "[w]hy wouldn't I stay at his hotel blocks from the White House, so I can tell the new president, 'I love your new hotel!' Isn't it rude to come to his city and say, 'I am staying at your competitor?'" (*Id.*)

Plaintiffs allege that, over the last two decades, the Kingdom of Saudi Arabia, as well as the Permanent Missions to the United Nations from India, Afghanistan, and Qatar purchased property at the Trump World Tower, paying anywhere from $4.5 million up to $8.375 million. (*Id.* ¶¶ 90–106.) Plaintiffs believe that these foreign entities continue to pay yearly common charges for building amenities amounting to tens of thousands of dollars each year. (*Id.*) Plaintiffs point out that none of these countries were included in Defendant's original or revised executive orders barring visitors from six Muslim-majority countries. (*Id.* ¶ 110.)

Plaintiffs allege that since 2006, Defendant has unsuccessfully sought trademark protection in China for the use of his name in connection with building construction services. After his application was rejected by China's Trademark Office, Defendant appealed to the Trademark Review and Adjudication Board, the Beijing Intermediate People's Court, and the Beijing High People's Court, to no avail. (*Id.* ¶ 111.) In December 2016, shortly after he was elected, Defendant spoke directly with the President of Taiwan, suggesting that the United States might abandon the "One China" policy that it had observed for decades. According to Plaintiffs, Defendant had previously suggested he would end the "One China" policy unless some benefit were received in exchange. (*Id.* ¶ 112.) On February 9, 2017, Defendant spoke with the President of China and pledged to honor the "One China" policy. Five days later, China reversed course and granted trademark protection for the "Trump" name. (*Id.* ¶¶ 113–14.) Plaintiffs also allege that the Industrial and Commercial Bank of China, a Chinese majority-state-owned entity, is one of the largest tenants of Trump Tower. (*Id.* ¶ 49.)

Plaintiffs allege that the Trump International Hotel's lease with the General Services Administration ("GSA")—an independent agency of the United States, whose administrator is appointed by the president—violates the Domestic Emoluments Clause. (*Id.* ¶¶ 130–44.) Prior to taking office, GSA entered into a 60–year lease for what eventually became the site for the Trump International Hotel. (*Id.* ¶¶ 130–31.) Section 37.19 of the lease agreement provides that "[n]o ... elected official of the Government of the United States ... shall be admitted to any share or part of

---

**2.** For purposes of this motion, Defendant has conceded that he is subject to the Foreign Emoluments Clause. (*See* Tr. of Oral Arg.,

ECF No. 99, at 94:11–13; Ltr. to the Ct. from Brett A. Shumate dated October 25, 2017, ECF No. 98.)

this Lease, or to any benefit that may arise therefrom." (*Id.* ¶ 132.) Plaintiffs allege that by virtue of his election, Defendant has been in breach of the lease since he took office on January 20, 2017. One week after Defendant released a proposed federal budget increasing GSA's funding while cutting nearly all other non-defense-related spending, GSA issued a letter indicating that, in its view, there were no compliance issues with respect to the lease. As of the date the SAC was filed, GSA has not made any effort to enforce the apparent breach against the Trump Organization. (*Id.* ¶¶ 135, 140–41, 145.)

Additionally, Plaintiffs contend that Defendant has also benefitted and will continue to benefit from payments to his hotels and restaurants by foreign governments and their agents, as well as federal, state, and local government officials. (*Id.* ¶¶ 200–01.)

Plaintiffs assert that they are injured by Defendant's alleged violations of the Emoluments Clauses. Phaneuf and Goode allege that due to Defendant's ongoing financial interest in hotels and restaurants receiving payments from governmental sources, they will suffer increased competition resulting in "loss of commission-based income" and "loss of revenue[.]" (*See id.* ¶¶ 225, 227, 234.) Similarly, ROC United alleges that its restaurant and restaurant-employee members have suffered injury in the form of "lost business, wages, and tips." (*Id.* ¶ 13.) CREW claims it has been harmed by having to divert and expend its resources to counteract the alleged violations, impairing its ability to accomplish its mission. (*Id.* ¶ 153.)

## II. LEGAL STANDARD UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)

■ "Determining the existence of subject matter jurisdiction is a threshold inquiry[,] and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quotation marks omitted), *aff'd*, 561 U.S. 247, 130 S.Ct. 2869, 177 L.Ed.2d 535 (2010). The party invoking the benefit of federal jurisdiction bears the burden of establishing the existence of that jurisdiction. *Sharkey v. Quarantillo*, 541 F.3d 75, 82–83 (2d Cir. 2008) (citation omitted).

■ In deciding a motion to dismiss "pursuant to Rule 12(b)(1), ... the Court must accept as true all material factual allegations in the complaint, but should refrain from drawing any inferences in favor of the party asserting jurisdiction." *People United for Children, Inc. v. City of New York*, 108 F.Supp.2d 275, 283 (S.D.N.Y. 2000) (citing *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992)). "[U]nder Rule 12(b)(1), [a court is] permitted to rely on non-conclusory, non-hearsay statements outside the pleadings." *M.E.S., Inc. v. Snell*, 712 F.3d 666, 671 (2d Cir. 2013).

## III. STANDING

■ Central to the question of whether this Court has subject-matter jurisdiction over this case is whether Plaintiffs have legal standing to sue. *See Cortlandt St. Recovery Corp. v. Hellas Telecomms. I, S.a.r.l*, 790 F.3d 411, 416–17 (2d Cir. 2015). Indeed, "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997). As the Supreme Court has explained, "[t]he law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used

to usurp the powers of the political branch-es[,]" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013), and "ensure[s] that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016). Accordingly, the standing inquiry is "especially rigorous" where, as here, "reaching the merits of the dispute would force [this Court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional." *Clapper*, 568 U.S. at 408, 133 S.Ct. 1138 (citation and quotation marks omitted).

■ The "irreducible constitutional minimum of standing" consists of three elements: "(1) 'an injury in fact' to 'a legally protected interest' that is both '(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical,' (2) 'a causal connection between the injury and the conduct complained of,' and (3) that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.' " *Crupar-Weinmann v. Paris Baguette Am., Inc.*, 861 F.3d 76, 79 (2d Cir. 2017) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). As the parties invoking this Court's jurisdiction, Plaintiffs bear the burden of establishing standing, and at the pleading stage, they must do so by "clearly alleg[ing] facts demonstrating each element." *Spokeo*, 136 S.Ct. at 1547 (citation omitted).

## A. ROC United, Phaneuf, and Goode Lack Article III Standing

Defendant contends that Plaintiffs ROC United, Phaneuf, and Goode (the "Hospitality Plaintiffs") lack standing to bring their claims and that their alleged injuries do not fall within the zone of interests of the Emoluments Clauses. (Mot. at 8–26.)

### 1. The Hospitality Plaintiffs' Competitor Standing Argument Fails

The Hospitality Plaintiffs attempt to rely on the competitor standing doctrine to establish injury in fact. Defendant argues that these Plaintiffs lack competitor standing because they fail to establish that the challenged governmental activity has caused "an actual or imminent increase in competition, which increase . . . will almost certainly cause an injury in fact." (Mot. at 20–21 (citing *Sherley v. Sebelius*, 610 F.3d 69, 73 (D.C. Cir. 2010)).)

■ "The Supreme Court has found cognizable injuries to economic competitors." *In re U.S. Catholic Conference*, 885 F.2d 1020, 1029 (2d Cir. 1989) (citation omitted); *see Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 403, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). The doctrine of competitor standing recognizes that economic actors "suffer [an] injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them." *Sherley*, 610 F.3d at 72 (citation and quotation marks omitted).

The doctrine traces its origin to a time when financial institutions started diversifying their service offerings and began competing with firms that had traditionally provided those services. For instance, in *Data Processing*, an association of data processing service providers challenged a ruling by the Comptroller of the Currency of the United States allowing banks to provide such services and compete in the same market. 397 U.S. at 151, 90 S.Ct. 827. The Court held that the association had standing to bring its claim because it properly alleged that the rule caused plaintiffs "injury in fact" in the form of future and

actual loss of profits. *Id.* at 152, 90 S.Ct. 827; *see also Clarke*, 479 U.S. at 403, 107 S.Ct. 750 (granting standing to trade association composed of securities brokers, dealers, and underwriters to challenge governmental ruling that banks could act as discount brokers); *Inv. Co. Inst. v. Camp*, 401 U.S. 617, 620–21, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971) (granting standing to association of open-end investment companies to challenge ruling that allowed bank entry into the field of collective investment funds); *Arnold Tours, Inc. v. Camp*, 400 U.S. 45, 46, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970) (holding travel agents had standing to challenge ruling to permit banks to offer travel services).

The Hospitality Plaintiffs argue that the competitor standing doctrine only requires a plaintiff to " 'show that he personally competes in the same arena' with the party to whom the defendant has unlawfully bestowed a benefit." (Pls.' Mem. of Law in Opp'n to Mot. ("Opp'n"), ECF No. 57, at 11.) They allege that they compete for government business in the Washington D.C. and New York City restaurant and hotel markets and that they have and will be harmed "due to foreign states, the United States, or state or local governments patronizing establishments with financial connections to Defendant rather than" Plaintiffs. (*See* SAC ¶¶ 13, 17, 19, 194, 198, 227, 234.) Defendant argues that the Hospitality Plaintiffs' allegations are far too speculative to give rise to competitor standing and that they have failed to sufficiently allege that they "personally compete[ ]" with Defendant's hotels and restaurants. (Mot. at 21 (citing *U.S. Catholic Conference*, 885 F.2d at 1029).) In response, the Hospitality Plaintiffs cite declarations from, among others, Goode, ROC United's restaurant members, and industry experts explaining how and in which ways they compete with Defendant's businesses. (*See, e.g.,* Opp'n at 17–18.)

■ Plaintiffs have failed to properly allege that Defendant's actions *caused* Plaintiffs competitive injury and that such an injury is *redressable* by this Court. As noted, Article III "requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant," and for which "prospective relief will remove the harm." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42, 45, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *see also Liberty Glob. Logistics LLC v. U.S. Mar. Admin.*, No. 13-CV-0399 (ENV), 2014 WL 4388587, at *5–6 (E.D.N.Y. Sept. 5, 2014) (finding plaintiff had established an injury in fact due to the "well-established concept of competitors' standing" but nonetheless dismissing certain claims for lack of causation) (citation omitted).

In *Simon*, the plaintiffs were indigent individuals and organizations representing indigents who challenged an IRS rule allowing favorable tax treatment to a nonprofit hospital that only offered emergency-room services to indigents. 426 U.S. at 28, 96 S.Ct. 1917. The plaintiffs argued that the IRS rule caused them injury because it "encouraged" hospitals to deny other services to indigents. *Id.* at 42, 96 S.Ct. 1917. The Court held that this alleged injury lacked traceability and redressability because of intervening causal factors. The Court found it "purely speculative whether ... denials of service ... [could] fairly ... be traced to petitioners' 'encouragement' or instead result[ed] from decisions made by the hospitals without regard to the tax implications." *Id.* at 42–43, 96 S.Ct. 1917. The Court found it "equally speculative" to conclude that "victory in this suit would result in [plaintiffs] receiving the hospital treatment they desire." *Id.* at 43, 45–46, 96 S.Ct. 1917. Rather than increasing access for indigent patients, hospitals could simply discontinue such programs altogether and become

profit-funded institutions, thereby exacerbating plaintiffs' injury. *Id.* at 45–46, 96 S.Ct. 1917.

 Here, the Hospitality Plaintiffs argue that Defendant has adopted "policies and practices that powerfully *incentivize* government officials to patronize his properties in hopes of winning his affection." (Opp'n at 16 (emphasis added).) Yet, as in *Simon*, it is wholly speculative whether the Hospitality Plaintiffs' loss of business is fairly traceable to Defendant's "incentives" or instead results from government officials' independent desire to patronize Defendant's businesses. Even before Defendant took office, he had amassed wealth and fame and was competing against the Hospitality Plaintiffs in the restaurant and hotel business. It is only natural that interest in his properties has generally increased since he became President. As such, despite any alleged violation on Defendant's part, the Hospitality Plaintiffs may face a tougher competitive market overall. Aside from Defendant's public profile, there are a number of reasons why patrons may choose to visit Defendant's hotels and restaurants including service, quality, location, price and other factors related to individual preference. Therefore, the connection between the Hospitality Plaintiffs' alleged injury and Defendant's actions is too tenuous to satisfy Article III's causation requirement. *Bennett v. Spear*, 520 U.S. 154, 167, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (to establish standing, "the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court") (citing *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130); *Clapper*, 568 U.S. at 413, 133 S.Ct. 1138 ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment.")

Moreover, the Hospitality Plaintiffs cannot establish "that it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Bennett*, 520 U.S. at 167, 117 S.Ct. 1154 (citation omitted). Plaintiffs seek an injunction preventing Defendant from violating the Emoluments Clauses. (SAC ¶ 20.) They argue that such injunction would "stop[ ] the source of intensified competition [and] provide redress." (Opp'n at 26.) Even if it were determined that the Defendant personally accepting any income from the Trump Organization's business with foreign and domestic governments was a violation of the Emoluments Clauses, it is entirely "speculative," *Bennett*, 520 U.S. at 167, 117 S.Ct. 1154, what effect, if any, an injunction would have on the competition Plaintiffs claim they face.[3]

Plaintiffs are likely facing an increase in competition in their respective markets for business from all types of customers—government and non-government customers alike—and there is no remedy this Court can fashion to level the playing field for Plaintiffs as it relates to overall competition. Were Defendant not to personally accept any income from government business, this Court would have no power to lessen the competition inherent in any patron's choice of hotel or restaurant. As explained more fully below, the Emoluments Clauses prohibit Defendant from receiving gifts and emoluments. They do not prohibit Defendant's businesses from competing directly with the Hospitality Plaintiffs. Furthermore, notwithstanding an injunction from this Court, Congress

---

3. For example, even if Defendant honored his pledge to establish a trust and donate all profits from foreign governments' business to the U.S. Treasury, (Mot. at 5; *see also* SAC ¶¶ 43–44), foreign government officials may still patronize Defendant's restaurants and hotels.

could still consent and allow Defendant to continue to accept payments from foreign governments in competition with Plaintiffs.

 Thus, while a court order enjoining Defendant may stop his alleged constitutional violations, it would not ultimately redress the Hospitality Plaintiffs' alleged competitive injuries.[4]

## 2. The Hospitality Plaintiffs' Competitive Injuries Do Not Fall Within the Zone of Interests of the Emoluments Clauses

 The zone of interests doctrine demonstrates that the Hospitality Plaintiffs are not the right parties to bring a claim under the Emoluments Clauses. Beyond the Article III requirements, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 474, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). "One of these is the requirement that the plaintiff establish that the injury he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the zone of interests sought to be protected by the statut[e] [or constitutional guarantee] whose violation forms the legal basis for his complaint." *Wyoming v. Oklahoma*, 502 U.S. 437, 468–69, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) (emphases in original) (citation and quotation marks omitted). While it is true that the "zone of interests" test first appeared in cases brought under the Administrative Procedure Act, 5 U.S.C. § 702, *see Data Processing*, 397 U.S. at 153, 90 S.Ct. 827, the Supreme Court has "made clear that the same test similarly applies to claims under the Constitution in general[.]" *Wyoming*, 502 U.S. at 469, 112 S.Ct. 789. In fact, the Supreme Court has "indicated that it is *more* strictly applied when a plaintiff is proceeding under a constitutional ... provision instead of the generous review provisions of the APA." *Id.* (emphasis in original) (citation and quotation marks omitted).

Nothing in the text or the history of the Emoluments Clauses suggests that the Framers intended these provisions to protect anyone from competition. The prohibitions contained in these Clauses arose from the Framers' concern with protecting the new government from corruption and undue influence. Indeed, at the time of the Founding, the new republic was conscious of the European custom of bestowing gifts and money on foreign officials. The Framers, who fought a war to gain their independence from British rule, wanted government officials to avoid future undue influence. As Edmund J. Randolph explained at the Virginia Ratifying Convention,

> The [Foreign Emoluments Clause] restrains any person in office from accepting of any present or emolument, title or office, from any foreign prince or state.... This restriction is provided to prevent corruption.

---

4. ROC United contends that it has associational standing to bring this lawsuit because it has alleged that its members have been "injured by the [D]efendant's distortion of competition." (Opp'n at 24–25.) To have associational standing, a plaintiff organization must meet the following requirements: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). ROC United lacks associational standing because none of its members—neither the restaurants nor restaurant workers—allege an injury in fact caused by Defendant's alleged Emoluments Clause violations that will likely be redressed by a favorable decision.

Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution*, 465–66 (2d ed. 1891); (*see also* Br. of Former Gov't Ethics Officers as Amici Curiae Supporting Pls., ECF No. 71–1, at 1 (stating that the Clauses "are an important check on corruption, and a beacon for good governance.").)

The Framers were not only concerned with foreign corruption, but they were also wary of undue influence from within. To ensure the president's independence from the states and additional financial incentives from the federal government, the Framers included in the Constitution the Domestic Emoluments Clause. That clause was meant to ensure that the president has "no pecuniary inducement to renounce or desert the independence intended for him by the Constitution." The Federalist No. 73 (Alexander Hamilton). Evidently, the Framers were concerned that

> [T]he legislature, with a discretionary power over the salary and emoluments of the [president], could render him as obsequious to their will as they might think proper to make him. They might, in most cases, either reduce him by famine, or tempt him by largesses, to surrender at discretion his judgment to their inclinations.

*Id.* The Clause also helps to ensure presidential impartiality among the states given that "[n]either the Union, nor any of its members, will be at liberty to give, nor will he be at liberty to receive, any other emolument than that which may have been determined by the first act." *Id.*

▮ Given this history, there can be no doubt that the intended purpose of the Foreign Emoluments Clause was to prevent official corruption and foreign influence, while the Domestic Emoluments Clause was meant to ensure presidential independence. Therefore, the Hospitality Plaintiffs' theory that the Clauses protect them from increased competition in the market for government business must be rejected, especially when (1) the Clauses offer no protection from increased competition in the market for *non-government* business and (2) with Congressional consent, the Constitution allows federal officials to accept foreign gifts and emoluments, *regardless* of its effect on competition. With Congress's consent, the Hospitality Plaintiffs could still face increased competition in the market for foreign government business but would have no cognizable claim to redress in court. There is simply no basis to conclude that the Hospitality Plaintiffs' alleged competitive injury falls within the zone of interests that the Emoluments Clauses sought to protect.

The Hospitality Plaintiffs therefore lack Article III standing.

## B. CREW Fails to Adequately Allege an Injury In Fact

▮ Defendant contends that Plaintiff CREW's claims should be dismissed because it has failed to adequately allege an injury in fact and thus also lacks standing to sue. (Mot. at 8.) An organization like CREW can have standing in one of two ways. As noted, an organization may have associational standing to sue on behalf of its members if some particular member of the organization would have had standing to bring the suit individually. *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012). Alternatively, an organization "may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). "Under this theory of 'organizational' standing, the organization is just another person—albeit a legal person—seeking to

vindicate a right." *N.Y. Civil Liberties Union*, 684 F.3d at 294. In either case, "the organization must 'meet the same standing test that applies to individuals by showing [an] actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision.'" *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998) (quoting *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990)). In other words, "[a]n organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III." *Simon*, 426 U.S. at 40, 96 S.Ct. 1917.

CREW does not allege that it has any members whose interests it seeks to represent here, nor does it otherwise purport to have associational standing. Rather, it asserts it has standing to bring this action because it suffers an injury in its own right, namely a "diversion[] of CREW's communications, legal, and research resources ... and [the] impairment of its programmatic functions." (Opp'n at 27.) CREW claims that by accepting payments to his businesses that are "rarely public," Defendant has deprived it of information concerning the financial support he receives from various governmental sources, "necessitating time consuming, more expensive, and less effective research to maintain its work." (*Id.*) CREW also asserts that it has had to devote significant resources to identify and counteract Defendant's alleged violations of the Emoluments Clauses, including through the use of "every member of CREW's research team on a near-daily basis" and "the hiring of two additional senior attorneys," as well as its efforts to explain the alleged violations to stakeholders, including the press, and assist and counsel others in counteracting Defendant's alleged violations. (*Id.* at 28.) CREW claims that these expenditures have all come "at the detriment of

CREW's efforts to perform mission-critical work that it would otherwise perform." (*Id.*)

Defendant argues that CREW lacks standing because it fails to allege sufficient injury in fact resulting from Defendant's alleged violations of the Emoluments Clauses. (Mot. at 8.) In particular, Defendant claims that CREW's voluntary diversion of resources, and the type of injury it claims to have suffered as a result, is "self-inflicted" and too abstract to confer standing. (*Id.* at 8–9.)

CREW's organizational standing argument relies principally on the Supreme Court's decision in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), and its progeny. In *Havens*, Housing Opportunities Made Equal ("HOME"), a nonprofit corporation, brought suit alleging that the defendants tried to steer members of racial and ethnic groups to buildings occupied primarily by members of the same groups and away from buildings and neighborhoods inhabited primarily by members of other races or groups in violation of the Fair Housing Act of 1968. *Id.* at 366–67, 102 S.Ct. 1114 & n.1. The organization's mission was to increase equal opportunity in housing through, among other ways, operating a housing counseling service and investigating and referring complaints concerning housing discrimination. HOME argued that it had standing because these activities were frustrated by the defendants' conduct. *Id.* at 368–69, 102 S.Ct. 1114. The Court held that HOME would suffer an injury in fact if the defendants' racial steering practices "perceptibly impaired" its ability to provide counseling and referring services to its members: "[s]uch concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply

a setback to the organization's abstract social interests[.]" *Id.* at 379, 102 S.Ct. 1114.

Following *Havens*, the Second Circuit has held that an organization has standing where the defendant's conduct or policy interferes with or burdens an organization's ability to carry out its usual activities. *See, e.g., Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) ("[I]f the Ordinance achieves one of its principal objectives—disbursement of day laborers—[the organization] will inevitably face increased difficulty in meeting with and organizing those laborers."); *N.Y. Civil Liberties Union*, 684 F.3d at 295 (the organization's ability to represent its clients in administrative hearings was "impeded" by the defendant's policy barring public access to such hearings). These decisions found organizational standing under *Havens* appropriate where there was a clear, articulable nexus between the challenged conduct or policy and its effects on the organization's ability to carry out specific functions within its purview.

Other Second Circuit decisions have extended *Havens* beyond the circumstance where an organization's activities are impaired *per se*. Those cases establish that an organization has standing where it is forced to expend resources to prevent some adverse or harmful consequence on a well-defined and particularized class of individuals. *See, e.g., Centro*, 868 F.3d at 110 (a local ordinance regulating the ability of day laborers to solicit employment will "force" the organization to expend greater resources since "if the laborers are dispersed, it will be more costly to reach them"); *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 158 (2d Cir. 2014) (the plaintiff, a nonprofit corporation devoted to fair-housing advocacy and counseling, expended resources to investigate its clients' housing discrimination claims and advocate on

their behalf); *Mental Disability Law Clinic, Touro Law Ctr. v. Hogan*, 519 Fed. Appx. 714, 716–17 (2d Cir. 2013) (the plaintiff organization expended resources to challenge the state mental health agency's policy of asserting counterclaims for outstanding treatment charges against patients who sued the agency and thereby discouraged patients from bringing such suits). Though the plaintiff organizations in these cases each pressed somewhat different claims, the common thread is clear: an organization was compelled to act, "with a consequent drain on [its] resources[,]" *Havens*, 455 U.S. at 379, 102 S.Ct. 1114, to remedy and counter the adverse consequences flowing from the defendant's conduct or policy. Put differently, the organization's expenditure of resources is prompted by a desire to prevent or limit some harm to a "legally protected interest." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130.

Here, CREW fails to allege either that Defendant's actions have impeded its ability to perform a particular mission-related activity, or that it was forced to expend resources to counteract and remedy the adverse consequences or harmful effects of Defendant's conduct. As noted, the plaintiff organizations in the cases cited by CREW were all driven to expend resources they would not have otherwise spent to avert or remedy some harm to a definable class of protected interests—for example, the right of individuals to pursue housing free from discrimination, or of day laborers to solicit employment—caused by the defendant's actions or policies. CREW, by contrast, may have diverted some of its resources to address conduct it may consider unconstitutional, but which has caused no legally cognizable adverse consequences, tangible or otherwise, necessitating the expenditure of organizational

resources.[5] *See New York v. U.S. Army Corps of Eng'rs*, 896 F.Supp.2d 180, 195 (E.D.N.Y. 2012) (rejecting argument that organization was injured by having to divert resources where "no one's concrete interests [were] invaded, [and thus] there [was] no initial injury to counter"). CREW has therefore failed to allege that it has been "perceptibly impaired" by Defendant's actions. *Havens*, 455 U.S. at 379, 102 S.Ct. 1114. Divorced from any concrete and legally cognizable impact caused by Defendant's conduct, CREW's allegations of injury amount to no more than an "abstract concern with a subject that could be affected by an adjudication." *Simon*, 426 U.S. at 40, 96 S.Ct. 1917. As the Supreme Court has made clear, "a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient" to confer standing on an organization. *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

 To be sure, CREW alleges that the time, money, and attention it has diverted to this litigation from other projects have placed a significant drain on its limited resources. But such an allegation, by itself, is insufficient to establish an injury in fact. CREW's decision to investigate and challenge Defendant's actions under the Domestic and Foreign Emoluments Clauses at the expense of its other initiatives reflects a choice about where and how to allocate its resources—one that almost all organizations with finite resources have to make.[6] (*See* SAC ¶ 175 ("[I]t is essential that CREW *prioritize* Defendant's violations of the Emoluments Clauses and conflicts of interest over those of lower level officials") (emphasis added).) If CREW could satisfy the standing requirement on this basis alone, it is difficult to see how any organization that claims it has directed resources to one project rather than another would not automatically have standing to sue. Under CREW's unbounded definition of standing, for example, a news organization could sue the President by alleging that one or more of his statements forced it to divert resources away from a different story it might have pursued. Surely something more is required to satisfy Article III standing, particularly where, as here, the plaintiff organization purports to be acting on behalf of the public as a whole. (*See id.* ¶ 154.)

Moreover, CREW's entire reason for being is to investigate and combat corruption and reduce the influence of money in politics through, among other things, education, advocacy, and litigation. (*Id.* ¶¶ 21–22.) CREW is thus not wasting resources by educating the public and issuing statements concerning the effects of Defendant's alleged constitutional violations or even by filing suit; this is exactly *how* an organization like CREW spends its resources in the ordinary

---

5. Although CREW's co-plaintiffs allege personal harm in the form of increased competition, as explained above, those injuries are not legally cognizable since they are neither fairly traceable to Defendant's conduct, nor are they capable of being redressed by a favorable decision on the merits. Moreover, as explained above, the harm they allege falls outside the Emoluments Clauses' zone of interests since increased competition is not an interest that those Clauses were designed to protect. *See* Part III.A.2.

6. Similarly unavailing are CREW's allegations that it has had to expend resources responding to press inquiries. Again, those allegations concerning where and how CREW allocates its resources are insufficient to constitute a legally cognizable injury in fact insofar as they are entirely self-inflicted and not borne out of CREW's need to remedy any particular adverse consequence or harmful effect of Defendant's conduct.

course. It therefore stands to reason that spending resources to investigate and challenge Defendant's alleged violations of the Domestic and Foreign Emoluments Clauses does not itself impose on CREW a concrete or particularized injury. *See Doe v. Vill. of Mamaroneck,* 462 F.Supp.2d 520, 542 (S.D.N.Y. 2006); *Small v. Gen. Nutrition Cos., Inc.,* 388 F.Supp.2d 83, 95 (E.D.N.Y. 2005).

The Second Circuit's decision in *Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898 (2d Cir. 1993), which CREW relies on, (Opp'n at 28–29), does not suggest a contrary result. In *Ragin,* the plaintiff organization brought suit under the Fair Housing Act challenging the defendant's racially discriminatory advertising practices. 6 F.3d at 901. The court found that the organization had standing because it "was forced" to spend time investigating and remedying the advertisements, including through filing an administrative complaint and a lawsuit in federal court, which prevented it from devoting more time and energy to its "regular tasks" of providing counseling and referral services. *Id.* at 905. In addition, the court noted, "[t]hat *some* of the [organization's] time was spent exclusively on litigating this action [did] not deprive [it] of standing." *Id.* (emphasis added). Here, CREW alleges that it was injured by having to divert resources to investigate and counteract Defendant's constitutional violations. But nearly *all* of the resources it expended were either in anticipation or direct furtherance of this litigation. *Ragin* is thus distinguishable.

*Nnebe v. Daus,* 644 F.3d 147 (2d Cir. 2011), is similarly distinguishable. There, the plaintiff organization brought suit under 42 U.S.C. § 1983 and the First and Fourteenth Amendments challenging an administrative rule pursuant to which taxi drivers' licenses were automatically suspended upon arrest for certain enumerated criminal charges. 644 F.3d at 149. The court recognized a circuit split on the issue of whether "litigation expenses alone [can] constitute damage sufficient to support standing" but reaffirmed *Ragin* as "good law" and observed that contrary decisions were "largely concerned with the capacity of organizations to 'manufacture' standing by bringing a suit." *Id.* (citations omitted). One such case, for example, involved a claim by an organization that it "suffered palpable injury when it was forced to divert resources to investigat[e] ... classified advertisements placed in the defendant newspapers ... for evidence of discrimination." *Id.* (quoting *Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers,* 141 F.3d 71, 78 (3d Cir. 1998)). In *Nnebe,* the court noted that the plaintiff organization was not "trolling for grounds to litigate" but rather "allocated resources to assist drivers only when another party—the City—ha[d] initiated proceedings against one of its members." 644 F.3d at 157–58.

Unlike the plaintiff organization in *Nnebe,* CREW did not expend resources in response to an "unbidden injury." *Centro,* 868 F.3d at 122 (Jacobs, J., dissenting). Rather, it sought out and voluntarily undertook efforts to investigate, research, and ultimately bring suit over Defendant's allegedly unlawful conduct, raising the prospect of manufactured standing, about which courts are justifiably concerned. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 107, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) ("Obviously, ... a plaintiff cannot achieve standing to litigate a substantive issue for the cost of bringing suit."); *Spann,* 899 F.2d at 27 ("An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation.") (Ginsburg, J.).

Since Plaintiff CREW has failed to adequately plead a cognizable injury in fact, it lacks standing to sue under Article III.

## IV. PRUDENTIAL CONSIDERATIONS

In addition to the other grounds upon which he seeks dismissal, Defendant argues that Plaintiffs' claims under the Foreign Emoluments Clause should be dismissed for certain prudential reasons. First, Defendant argues that Plaintiffs' claims are better left resolved through the "political process," rather than the courts, because Congress is "far better equipped" to address whether Defendant's particular activities violate the Foreign Emoluments Clause. (Opp'n at 50.) Defendant points out that Congress has more tools at its disposal, including the ability to legislate and consent to Foreign Emoluments Clause violations. (*Id.*)

Defendant seems to argue, without explicitly stating so, that the "political question" doctrine bars Plaintiffs' claims. The doctrine would suggest that Plaintiffs' suit presents a political issue that should be resolved between Congress and the President, without any preemptive interference from the Judiciary.

 Plaintiffs' Foreign Emoluments Clause claims do implicate political question concerns. The political question doctrine has its roots in the separation of powers and is ultimately a doctrine of justiciability. It bars courts from deciding cases that are inappropriate for judicial resolution based on a lack of judicial authority or competence, or other prudential considerations. As originally articulated by the Supreme Court in *Baker v. Carr*, a case may be dismissed on the basis of the political question doctrine if there exists: "[1] a textually demonstrable constitutional commitment of the issue [at hand] to a coordinate political department; [2] a lack of judicially discoverable and manageable

standards for resolving it; [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question." 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

Each of these factors may serve as an independent ground for dismissal. *See Vieth v. Jubelirer*, 541 U.S. 267, 277–78, 124 S.Ct. 1769, 158 L.Ed.2d 546 (2004). The first factor addresses a court's legal authority to resolve the particular issue presented, the second and third focus on the Judiciary's competence to do so, and the final three concern prudential considerations that may counsel against a court's resolution of the issue. The *Baker* factors are generally viewed as being listed in descending order of importance. *Vieth*, 541 U.S. at 278, 124 S.Ct. 1769. In fact, cases applying *Baker* have placed a disproportionate emphasis on the first two factors. *See Alperin v. Vatican Bank*, 410 F.3d 532, 545 (9th Cir. 2005) (collecting cases).

 Here, the issue presented under the Foreign Emoluments Clause is whether Defendant can continue to receive income from his business with foreign governments without the consent of Congress. As the explicit language of the Foreign Emoluments Clause makes clear, this is an issue committed exclusively to Congress. As the only political branch with the power to consent to violations of the Foreign Emoluments Clause, Congress is the appropriate body to determine whether, and to what extent, Defendant's conduct unlawfully infringes on that power. If Con-

gress determines that an infringement has occurred, it is up to Congress to decide whether to challenge or acquiesce to Defendant's conduct. As such, this case presents a non-justiciable political question.

Defendant also suggests that Plaintiffs' case should be dismissed because Congress has yet to take any action with respect to Defendant's alleged violations of the Foreign Emoluments Clause. Defendant notes that if Congress wanted to do something about Defendant's conduct, it could. (Opp'n at 50.) Congress could, for example, enact legislation codifying its views by statute or expand the Constitution's conflict-of-interest protections. (*Id.*) But, because Congress has yet to take any action with respect to Defendant's alleged violations, Defendant contends that Plaintiffs' Foreign Emoluments Clause claims are premature. (*See id.*)

 Plaintiffs' Foreign Emoluments Clause claims are indeed not ripe for judicial review. Ripeness is a different justiciability doctrine designed to prevent courts from prematurely adjudicating cases. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1976). In *Goldwater v. Carter*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979), Justice Powell articulated a test to be used in cases involving a confrontation between the legislative and executive branches to determine whether the issue presented was ripe for review, which is particularly instructive here. In that case, members of Congress brought suit against President Carter after he announced his intention to unilaterally terminate a mutual defense treaty between the United States and Taiwan. *Goldwater v. Carter*, 617 F.2d 697, 700–01 (D.C. Cir. 1979), *vacated*, 444 U.S. 996, 100 S.Ct. 533, 62

L.Ed.2d 428 (1979). The plaintiffs there claimed that such action, without ratification from the Senate, infringed upon Congress's treaty power. *Id.* The D.C. Circuit reversed the lower court's ruling and held that the President did not exceed his constitutional authority in terminating the treaty. *Id.* at 709.

 In remanding the case with instructions to dismiss the complaint, Justice Powell stated that "a dispute between Congress and the President is not ready for judicial review unless and until each branch has taken action asserting its constitutional authority." *Goldwater*, 444 U.S. at 996, 100 S.Ct. 533. He noted further that "[t]he Judicial Branch should not decide issues affecting the allocation of power between the President and Congress until the political branches reach a constitutional impasse." *Id.* In the *Goldwater* case, Justice Powell explained that no such impasse had been reached because Congress had yet to take any action either denouncing or approving the President's actions.[7] *Id.* at 998, 100 S.Ct. 533.

Here, Plaintiffs' suit implicates a similar concern regarding a conflict between two co-equal branches of government that has yet to mature. As indicated earlier, the Foreign Emoluments Clause makes clear that Congress, and Congress alone, has the authority to consent to violations of that clause. Plaintiffs' principal allegation is that Defendant has completely ignored this balance of power by continuing to accept emoluments without Congressional approval. (SAC ¶¶ 39–42.) As such, this case involves a conflict between Congress and the President in which this Court should not interfere unless and until Congress has asserted its authority and taken

---

**7.** Subsequent cases have followed Justice Powell's reasoning in *Goldwater* in dismissing a case on ripeness grounds. *See, e.g., Sanchez–Espinoza v. Reagan*, 770 F.2d 202, 210 (D.C. Cir. 1985) (Ginsburg, J., concurring); *Dellums v. Bush*, 752 F.Supp. 1141, 1149–51 (D.D.C. 1990); *Lowry v. Reagan*, 676 F.Supp. 333, 339 (D.D.C. 1987).

some sort of action with respect to Defendant's alleged constitutional violations of its consent power.[8]

At this stage, it would be "both premature and presumptuous for [a court] to render a decision on the issue of [whether Congress's consent] is required at this time or in the near future when ... Congress itself has provided no indication whether it deems such [consent] either necessary, on the one hand, or imprudent, on the other." *Dellums v. Bush*, 752 F.Supp. 1141; 1149–50 (D.D.C. 1990). If Congress wishes to confront Defendant over a perceived violation of the Foreign Emoluments Clause, it can take action. However, if it chooses not to, "it is not [this Court's] task to do so." *Goldwater*, 444 U.S. at 998, 100 S.Ct. 533. This Court will not tell Congress how it should or should not assert its power in responding to Defendant's alleged violations of the Foreign Emoluments Clause. In short, unless and until Congress speaks on this issue, Plaintiffs' Foreign Emoluments Clause claims are not ripe for adjudication.

## V. CONCLUSION

Defendant's motion to dismiss is GRANTED. Accordingly, Plaintiffs' claims and this case are DISMISSED.

SO ORDERED.

---

8. Congress is not a potted plant. It is a coequal branch of the federal government with the power to act as a body in response to Defendant's alleged Foreign Emoluments Clause violations, if it chooses to do so.